UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

RANDI DUNDA,                                          **No. 6:15-cv-6232-MAT**

                                   Plaintiff,          **DECISION AND ORDER**

                -vs-

AETNA LIFE INSURANCE COMPANY,

                                   Defendant.

---

### INTRODUCTION

Represented by counsel, Randi Dunda ("Dunda" or "Plaintiff") instituted this action against Aetna Life Insurance Company ("Aetna" or "Defendant") pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et seq. ("ERISA"). Plaintiff challenges the termination of her long-term disability ("LTD") benefits by Aetna, and seeks declaratory relief and attorney's fees.

### BACKGROUND

In 2007, Plaintiff was employed by Wawa, Inc. ("Wawa") as a General Manager at one of their stores. Plaintiff was a participatnt in the Wawa-sponsored the LTD plan ("the Plan"), which is governed by ERISA.

The Plan is insured under a group policy of insurance issued by Defendant, who is the claims fiduciary of the Plan and has discretionary authority to (1) "determine whether and to what

-1-

extent employees and beneficiaries are entitled to benefits;" and (2) "construe any disputed or doubtful terms of this policy." (AR.60).[1] The Plan sets out the following "test of disability" for the receipt of LTD benefits:

> From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:
>
> > • you are not able to perform the material duties of your *own occupation* solely because of: disease or injury; and
> >
> > • your work earnings are 80% or less of your adjusted predisability earnings.
>
> After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at *any reasonable occupation* solely because of:
>
> > • disease; or
> > • injury.

(AR.4) (emphases supplied). The Plan defines "reasonable occupation" as "any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 80% of your adjusted predisability earnings." (AR.15) (emphases omitted). According to the Plan, a "period of disability ends on the first to occur of" several events, including "[t]he date [Aetna] finds you are no longer disabled or the date you fail

---

[1]

Citations to "(AR. )" refer to pages in the Administrative Record, prepared by Aetna and Bates-numbered "Dunda 00001-01223." The Court has omitted the placeholder zeros from its citations.

-2-

to furnish proof that you are disabled;" or "[t]he date your condition would permit you to work, or increase the number of hours you work, or the number or type of duties you perform in your own occupation, but you refuse to do so." (AR.5).

The Plan provides that "other income" benefits, such as benefits under the Social Security Act ("SSA"), reduce the monthly LTD benefits paid pursuant to the Plan. (AR.6-7). In particular, the Plan provides that if payments are made in amounts greater than the benefits that a claimant is entitled to receive, "Aetna has the right to require the claimant to return the overpayment on request[.]" (AR.12). If the overpayment occurs as a result of the claimant's "receipt of other income benefits for the same period in which [the claimant] ha[s] received a benefit under this Plan;" and "to obtain such other income benefits, advocate or legal fees were incurred[,]" Aetna "will exclude from the amount to be recovered, such advocate or legal fees; provided [the claimant] return[s] the overpayment to Aetna within 30 days of Aetna's written request for the overpayment." (AR.12).

On August 30, 2007, Plaintiff commenced a disability-related leave from her employment and received short-term disability ("STD") benefits. Her diagnoses were lumbar herniated nucleus pulposus,[2] low back pain, and a herniated disc at L5-S1. When the

---

[2] "Herniated nucleus pulposus is prolapse of an intervertebral disk through a tear in the surrounding annulus fibrosus. The tear causes pain; when the disk impinges on an adjacent nerve root, a segmental radiculopathy with paresthesias

-3-

period of Plaintiff's eligibility for STD benefits was nearing an end, Defendant began investigating whether Plaintiff qualified for LTD benefits under the Plan's "own occupation" test of disability. On April 15, 2008, Defendant's internal claims reviewer concluded that Plaintiff

> has been refractory to all [conservative treatment] methods to date. . . . . Prognosis for full recovery remains good, although the longer the complaints continue, the more likely it will result in more aggressive treatment and residual impairment.

(AR.384). Aetna accordingly awarded LTD benefits to Plaintiff under the Plan's "own occupation" test of disability, effective February 29, 2008. (AR.617-18).

On November 12, 2008, Defendant informed Plaintiff that she "may be eligible for Social Security disability benefits," and that it "believe[d] a Social Security Application on [her] behalf [was] warranted." (AR.643). Defendant stated that it was making available to her the services of Allsup, Inc., a nationwide disability representation company, to assist her in applying for Social Security disability insurance ("SSDI") benefits. (AR.643). On August 14, 2010, the SSA issued a notice of award of benefits to Plaintiff, retroactively payable from February 29, 2008. (AR.1147-

_____

and weakness in the distribution of the affected root results. . . . Patients with progressive or severe neurologic deficits, intractable pain, or sphincter dysfunction may require immediate or elective surgery[.]" Michael Rubin, MDCM, Herniated Nucleus Pulposus, Merck Manual – Professional Version, avail. at http://www.merckmanuals.com/professional/neurologic-disorders/peripheral-nervous-system-and-motor-unit-disorders/herniated-nucleus-pulposus (last accessed Apr. 19, 2016).

-4-

52).

Meanwhile, in anticipation of the "own occupation" period ending on February 28, 2010, a nurse at Aetna reviewed Plaintiff's medical records and concluded, "It is reasonable that claimant lacks work capacity at all levels at this time due to ongoing pain, limited range of motion, and inability for prolonged sitting, [and] standing. However, with ongoing therapy, there is [a] possibility that [she] may recover some work capacity." (AR.129). Accordingly, Defendant approved Plaintiff for benefits under the "more strict definition of disability[,]" (AR.617), i.e., the "any reasonable occupation" test of disability. (AR.135-37).

On January 26, 2012, about two years after Plaintiff had begun receiving benefits under the "any reasonable occupation" standard on February 26, 2010, Defendant conducted an occupational assessment. As a result of this assessment, Aetna found that Plaintiff "does appear to have" sedentary to light skills for alternate occupations within the sedentary-light physical demand level, with the potential to reach the reasonable wage criteria in the Plan. (AR.194).

On November 7, 2013, Plaintiff's primary care physician, Rachel Conley, M.D., completed an Attending Physician Statement and Capabilities and Limitations Worksheet. (AR.946-48). According to Dr. Conley, Plaintiff was able to perform sedentary work activity for at least 4 hours per day, and could frequently lift 1 to 5

-5-

pounds; occasionally lift 6 to 20 pounds; and frequently walk, sit, stand, and reach above her shoulders. (AR.948). After Dr. Conley left the practice in 2014, Plaintiff established care with Dr. Eric Shives, who was part of the same practice. (AR.870-71).

On September 23, 2014, treating chiropractor Erica Callahan, D.C., completed a report stating that Plaintiff could work 4 hours per day at the sedentary level. (AR.937). Dr. Callahan's assessment was "based upon subjective report of patient of functional abilities, objective findings, outcome assessments and previous history of spinal surgery and fusion via surgery" and Plaintiff's Oswestry Low Back Pain Disability Questionnaire[3] scores on September 18, 2014. (AR.937).

During a September 22, 2014, telephone interview, Plaintiff informed the Aetna representative that she was pursuing online studies to become a wellness coach. After graduation, she planned to work at her partner's chiropractic office so that her work schedule could be flexible, and she could sit, stand, and lie down as needed. (AR.248).

On September 24, 2014, Plaintiff's new primary care physician, Dr. Shives, submitted a CLW form that she had dropped off at his office for him to complete. In the CLW, Dr. Shives opined that

---

[3]

The Oswestry Low Back Pain Disability Questionnaire is a validated questionnaire used by clinicians and researchers to quantify disability due to low back pain. See http://www.rehab.msu.edu/_files/_docs/Oswestry_Low_Back_Disability.pdf.

Plaintiff had full-time (8 hours per day) work capacity with restrictions equivalent to seated/desk work (AR.939), which was contrary to all of the reports issued in the past by Dr. Conley, and also contrary to the reports issued by chiropractor Dr. Callahan.

On October 6, 2014, Kimberly Pease ("Nurse Pease") at Aetna conducted a clinical review and concluded that, "based on the clinical documentation submitted for review," Plaintiff's "musculoskeletal condition appears to have stabilized and she has regained sufficient functional capabilities for seated/desk work at this time." (AR.263).

On October 22, 2014, Aetna requested completion of a transferable skills analysis/labor market survey ("TSA/LMS") with regard to sedentary occupations exceeding the reasonable hourly wage of $26.28 that Plaintiff possibly could perform. (AR.266-67). The following positions were identified in the TSA/LMS: Merchandise Manager, Market Manager, and Hotel Services Sales Representative. (AR.268-69, 1222-23).

By letter dated October 31, 2014, Aetna's LTD Benefit Manager Lindsay Cobb ("Cobb") informed Plaintiff that her LTD benefits would be terminated as of that date. (AR.791-93). Cobb cited Dr. Shives' office notes, his September 2014 report, and Dr. Callahan's chiropractic records indicating that Plaintiff had subjective symptoms that fluctuate and that it was not clear if her worsening

symptoms were based on increased activities. (AR.792). Cobb also noted that Plaintiff's recent telephone interview indicated that she had the ability to travel and engage in multiple activities on a daily basis. (Id.). According to Cobb, Plaintiff's "family medicine records do not provide quantifiable examination findings to support an ongoing musculoskeletal impairment; cardiac issues were ruled out via diagnostic workup; subjective reports of chest pain appear to be anxiety related, which is now considered resolved." (AR.792). Cobb "considered [Plaintiff] capable of sustaining at least sedentary work capacity," which she defined as "[l]ifting, [c]arrying, [p]ushing, or [p]ulling 10 lbs. occasionally. Mostly sitting; may involve standing or walking for brief periods of time." (Id.). With regard to Plaintiff's award of SSDIB, Cobb noted, "[T]he information we have isn't enough to show that you aren't able to work. . . . We don't have the information that was used to make your SSD benefit decision. We can only use the information we have to make our decision." (AR.792). Plaintiff was informed of her right to appeal, and that Aetna would review any additional information she submitted. (AR.793).

Plaintiff appealed, and submitted a supplementary letter dated November 6, 2014. (AR.870-73). Plaintiff stated she was unable to return to work because she cannot stand for more than 10 minutes at a time, cannot sit for more than 30 to 45 minutes at a time, cannot walk for more than 30 minutes at a time, cannot lift more than 10

pounds, cannot carry any amount of weight for any distance, and must lie down for about 60 minutes at least once a day due to continuous pain in her lower, middle, and upper back and her neck, as well as left-side sciatica pain. (Id.).

Dr. Callahan submitted a letter dated November 5, 2014, "recommend[ing] a complete prohibition of more strenuous activities such as stooping, crawling, climbing, bending, and twisting." (AR.860). It was recommended that Plaintiff only work up to 4 hours per day at a sedentary job, with the option to change positions throughout the day "will help to prevent frequent aggravation of neck and low back symptoms." (AR.862). Dr. Callahan stated that "[o]bjectively, [Plaintiff] presents with chronic moderate to severe pain throughout her neck, back and legs" with "moderate to severe restricted ranges of motion in the neck and lower back[,]" especially in the lower back due to her previous spinal surgery. (AR.862). Dr. Callahan then stated her "medical opinion is based largely upon subjective reports," as she did "not have the capacity to have [Plaintiff] sit in [the] office, performing sedentary job requirements for 4 hours [to] see how it affects her neck and lower back." (AR.862).

In a one-paragraph letter dated November 10, 2014, Dr. Shives explained that the CLW he had submitted in September 2014, had "mistakenly listed duration of condition as 4 weeks for her back pain flare at that time." (AR.865). Dr. Shives stated that he had

marked the "check box for 8 hours . . . in error," and that it
"should have been checked as 4 hours as previously stated by Dr.
Conley from our office in Nov[ember] 2013." (AR.865). Dr. Shives
noted that Plaintiff has chronic low back pain and degenerative
disk disease, and "her condition should be listed as lifelong."
(AR.865). In a report also dated November 10, 2014, Dr. Shives
opined that Plaintiff frequently could perform the following
activities: reach above the shoulder, forward reach, sit, stand,
walk, perform repetitive motions, and lift 1 to 5 pounds. (AR.856).
Plaintiff could occasionally lift 6 to 20 pounds and could perform
the following head and neck movements: static position, frequent
flexing, and frequent rotation. She also could operate a motor
vehicle, hazardous machinery, and power tools. Dr. Shives stated
that Plaintiff could work 4 hours per day. (AR.856).

After reviewing Dr. Callahan's November 5, 2014, letter;
Plaintiff's November 6, 2014, letter; and the November 10, 2014,
letter and report from Dr. Shives, Nurse Pease noted the
discrepancy between these documents and Dr. Shives' report from
September 2014. Nurse Pease observed that Plaintiff herself
"describes [an] active lifestyle, with modified exercise and
frequent position changes" and "appears to have higher level
activity than the 11/10/14 CLW [from Dr. Shives] indicates."
(AR.279). Nurse Pease stated that was "no current clinical
information with objective findings such as diagnostic studies or

documented impaired [range of motion] by degrees, antalgic gait or symptoms/treatment for intractable pain which would preclude claimant from full time work capacity." (AR.279-82). Accordingly, Aetna did not alter its determination that Plaintiff was not disabled under the Plan.

Aetna then retained independent medical consultant Dr. Frank Polanco, who performed a paper review of Plaintiff's case but did not conduct an IME. In a report dated December 23, 2014 (AR.827-32), Dr. Polanco found that the medical documentation did not support the limitations of a 4-hour work capacity at the sedentary level. Dr. Polanco noted that "[a]s her physician has stated, his restrictions are based on self[-]reports of functional capacity. There are no clinical or diagnostic findings to support that the claimant is incapacitated or limited to a sedentary 4 hour level of physical capacity." (AR.832). According to Dr. Polanco,

> [w]hile the claimant has multiple pain complaints, there are no findings on medical examinations or diagnostic testing that are significantly functionally/physically limiting. There are no findings that would restrict or limit normal and routine activities such as walking, standing, lifting, carrying, or use of upper and lower extremities. The medical records reflect the claimant retains functional mobility and strength and there are no findings that would preclude full-time work within the restrictions noted.[4]

---

[4]

According to Dr. Polanco, "[t]he restrictions supported are as follows: Occasional lifting and carrying to 20 lbs., push/pull 45 lbs., occasional kneeling and crawling. Occasional walking and standing limited to 30 minutes at one time. Unrestricted sitting and use of upper and lower extremities. Ability to alter positions as necessary."

(AR.831-32).

By letter dated January 26, 2015, Senior LTD Appeals Manager Charlai J. Lang ("Lang") informed Plaintiff that Aetna was upholding its decision to terminate her LTD benefits as of November 7, 2014. (AR.812-14). because its review of the information received and the results of Dr. Polanco's report did not support Plaintiff's claim that she is unable to perform full-time work at the sedentary level. (AR.812-13). Having thus exhausted her administrative remedies, Plaintiff timely commenced this action.

## DISCUSSION

### I.   Appropriate Standard of Review and the Existence of a Conflict of Interest

"ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 49 (2d Cir. 1996). The Supreme Court has held that "a denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

Plaintiff and Defendant, after the summary judgment motion originally was submitted, jointly sought permission to file supplemental briefing. See Plaintiff's Supplemental Brief (Dkt #27); Defendant's Supplemental Memorandum of Law (Dkt #28).

Plaintiff argues that review should be <u>de novo</u>, citing <u>Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.</u>, 819 F.3d 42, 57-58 (2d Cir. 2016) (holding that "when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed <u>de novo</u> in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless"). Defendant questions whether <u>Halo</u>, <u>supra</u>, is even applicable to the present case. The Court agrees with Defendant's reading of <u>Halo</u>—that involves a plan administrator's noncompliance with federal regulations not at issue here. And, as Defendant argues, Plaintiff has not demonstrated that <u>Halo</u> should apply to her case.

Defendant also argues that Plaintiff should not be permitted to escape its stipulation, in the Proposed Discovery Plan, filed July 2, 2015, that "[t]he parties agree the governing standard of review is abuse of discretion." Dkt #11, p. 1. This Court is effectively sitting as an appellate court, and therefore is "not bound by stipulations as to questions of law." <u>Regula v. Delta Family-Care Disability Survivorship Plan</u>, 266 F.3d 1130, 1138 (9th Cir. 2001) (citations omitted), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003). In the ERISA

context, courts have declined to treat as binding a party's stipulation to a particular standard of review. See id.; see also Coleman v. Pikeville United Methodist Hosp., Inc., No. CIV.A. 05-32-EBA, 2008 WL 819038, at *3 (E.D. Ky. Mar. 25, 2008) (claimant and administrator "jointly stipulated that the appropriate standard of review for the Court to apply in this action is the arbitrary and capricious standard" but the claimant subsequently argued, in motion papers, that the instant action did not present a claim under ERISA, and, alternatively, if the action is under ERISA, that the appropriate standard of review is de novo; court considered, as threshold issues, ERISA's applicability to the instant action, and if found to be applicable, the appropriate standard of review). Accordingly, the Court will determine which standard of review should apply.

Aetna, as "[t]he plan administrator[,] bears the burden of proving that the deferential standard of review applies." Fay v. Oxford Health Plan, 287 F.3d 96, 103-04 (2d Cir. 2002)(citation omitted). Here, the Plan, by its clear terms, gives Aetna authority to (1) "determine whether and to what extent employees and beneficiaries are entitled to benefits;" and (2) "construe any disputed or doubtful terms of this policy." (AR.60). The Plan thus "grants . . . [Aetna] complete discretion to make long-term benefit eligibility decisions and to construe the terms of the plan." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995). Aetna's

decision to deny Plaintiff LTD benefits "must be affirmed unless it was arbitrary and capricious." Id.

The fact that Aetna is operating under a conflict of interest does not alter the Court's conclusion. In Metropolitan Life Insurance Company v. Glenn, 554 U.S. 105 (2008) ("Glenn"), "the Supreme Court held that an ERISA-fund administrator that 'both evaluates claims for benefits and pays benefits claims' is conflicted, and that a district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in its analysis." Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 138 (2d Cir. 2010) (quotation omitted). While employer-administrators have a "categorical conflict[,]" id., "Glenn recognized that the dual-role conflict may arise with other administrators as well, such as insurer -administrators[,]" id. at 138, because they "both decide[ ] who gets benefits and pay[ ] for them." Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 868 (9th Cir. 2008). The weight accorded to the conflict "varies in direct proportion to the 'likelihood that [the conflict] affected the benefits decision[.]" Durakovic, 609 F.3d at 139. Here, Aetna is operating under a dual-role conflict of interest, since it both decides who receives benefits under the Plan, and pays for those benefits. Thus, "it has a direct financial incentive to deny claims." Saffon, 522 F.3d at 868 (citation omitted). The Court will consider this conflict in determining whether Aetna's

-15-

determination to deny benefits was arbitrary and capricious. "'[W]here the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious.'" Miles v. Principal Life Ins. Co., 720 F.3d 472, 486 (2d Cir. 2013) (quoting McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir. 2008); other quotation omitted)).

## II.  Whether Aetna's Determination Was Arbitrary and Capricious

### A.  Aetna's Requirement of Objective Evidence and Failure to Fully Credit Plaintiff's Subjective Complaints

Plaintiff alleges that Defendant failed to provide a full and fair review of her claim by requiring "objective support for her medical conditions," even though (1) the Plan does not require such proof, and (2) the Second Circuit has stated that subjective complaints alone may constitute sufficient evidence of disability. See Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127, 136 (2d Cir. 2001) ("It has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability.") (internal quotation marks omitted). Plaintiff is correct that under certain circumstances, a plan administrator's demand for objective evidence has been found to be indicative of arbitrary and capricious decision-making. See, e.g., Tanner v. Nationwide Mut. Ins. Co., 804 F. Supp. 2d 601, 608 (S.D. Ohio 2011) ("Arbitrary decisions may also include ones which accept

a file reviewer's disregard of subjective reports of symptoms based solely on a review of medical records which do not contain objective support for the claimant's complaints[.]") (citing Calvert v. Firstar Fin., Inc., 409 F.3d 286, 296 (6th Cir. 2005)). In Tanner, for instance, the ERISA plan did not use the phrase "objective medical evidence," did not contain the word "objective," and did not include any other provision including such language, or relating the phrase "objective medical evidence" to what constituted acceptable evidence of a disabling condition. Thus, the the phrasing of the medical consultant's conclusion of "not disabled" "certainly raise[d] some question about whether he has read a requirement into the [p]lan which is not there, and then used that non-existent requirement as a basis for concluding that [the claimant] does not meet the [p]lan's definition of 'long-term disabled.'" Tanner, 804 F. Supp. 2d at 613 (finding that administrator erred in "insist[ing] that the objective evidence be sufficient to resolve all of the issues in the case, including the amount of pain being experienced by the claimant"; "[i]f that were a permissible interpretation of this plan, no claimant with a condition which can cause disabling pain, but which sometimes does not, could ever qualify for disability because the objective tests rarely, if ever, precisely quantify the amount of pain which any particular individual is suffering") (citing Pelchat v. UNUM Life Ins. Co. of Am., No. 3:02-cv-7282, 2003 WL 21105075, at *11 (N.D.

-17-

Ohio Mar. 25, 2003) ("The policy does not condition benefits on clinical evidence of the existence of the condition that renders a claimant disabled. To construe plaintiff's policy to impose a requirement of 'objective medical evidence' would rewrite the policy. As courts have acknowledged, 'an administrator lacks discretion to rewrite the Plan.'") (quoting <u>Saffle v. Sierra Pacific Power Co.</u>, 85 F.3d 455, 460 (9th Cir. 1996); citing <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 443 (3d Cir. 1997) (concluding it was arbitrary and capricious for an administrator to require "objective medical evidence" to prove disability when policy contained no such requirement); other citation omitted)).

Here, as in <u>Tanner</u>, the Plan does not use the phrase "objective medical evidence," did not contain the word "objective," and did not include any other provision including such language, or relating the phrase "objective medical evidence" to what constituted acceptable evidence of a disabling condition. Indeed, as Plaintiff argues, Aetna granted her LTD benefits under the more stringent "any occupation" disability standard for over four years, based on essentially the same medical evidence that, in October 2014, it discredited as "not objective" and therefore insufficient to support a finding of disability. The Court is "not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment

of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002); see also Saffon, 522 F.3d at 871 ("[A]ssuming that the MRIs document no 'progression in degeneration,' MetLife does not explain why further degeneration is necessary to sustain a finding that Saffon is disabled. After all, MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration."). In the present case, the Court finds that the previous payment of benefits to Plaintiff, without requiring a showing of "objective medical evidence" suggests arbitrariness in Aetna's decision to discontinue those benefits. See id.

**B.   Aetna's Failure to Consider the SSA's Disability Finding**

Plaintiff argues that the SSA's ruling awarding her disability benefits was relevant to the determination of LTD benefits under the Plan. Plaintiff further contends that Dr. Polanco, Aetna's medical consultant, erroneously failed to analyze or consider it, though he apparently was aware of that finding. Indeed, Dr. Polanco's report indicates that among the documents he reviewed were those dated "07/07/11-8021090-08/14/10 [from the] Social Security Administration." (AR.828).

Although disability determinations by the SSA are not binding

upon an ERISA plan administrator, they nevertheless are "'relevant and instructive' in a [c]ourt's determination of whether a plan administrator acted arbitrarily and capriciously." <u>Adams v. Metro. Life Ins. Co.</u>, 549 F. Supp. 2d 775, 788 (M.D. La. 2007) (quoting <u>White v. Airline Pilots Assoc.</u>, 364 F. Supp.2d 747, 767 (N.D. Ill. 2005); other citations omitted). Courts have found SSA determinations especially relevant when the plan administrator "'(1) encourages the applicant to apply for SSD payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability[.]" <u>Connor v. Sedgwick Claims Mgmt. Servs., Inc.</u>, 796 F. Supp.2d 568, 585 (D. N.J. 2011) (quotation and citations omitted). In such cases, "'the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.'" <u>Id.</u> Here, as noted above, Aetna encouraged Plaintiff to apply to the SSA for SSDI benefits. In addition, Aetna made available the services of a disability representation firm, Allsup, to assist her in pressing her claim before the SSA. Then, once she was awarded disability benefits, Allsup collected over $37,071.10 in overpaid SSA benefits. Approximately $34,021 of that amount was returned to Aetna per the terms of the Plan.[5] (AR.144-45, 149). Furthermore, Aetna's

---

[5]

Allsup retained $3,050 in fees out of the $37,071.10 collected is past benefits. (AR.149).

financial obligation to Plaintiff was reduced due to her receipt of SSDI beneifts.[6] Aetna thus financially benefitted from Plaintiff's successful application to the SSA.

Aetna purported to explain why it took a position different from the SSA on the question of disability when Lang wrote to Plaintiff notifying her of Aetna's decision to uphold the benefits denial. While Lang stated that she recognized Plaintiff was receiving SSDI benefits, she asserted that the information Aetna had received was not "enough" to show that Plaintiff is unable to work. Lang further asserted that Aetna did not receive the information used by the SSA to determine whether Plaintiff should be granted SSDI benefits. It is difficult to credit these statements in light of the fact that Allsup routinely kept Aetna apprised of developments in Plaintiff's case before the SSA. As noted above, Aetna's medical consultant, Dr. Polanco, indicated in his report that among the documents he reviewed were those dated "07/07/11-8021090-08/14/10 [from the] Social Security Administration." (AR.828). This contradicts Aetna's assertion that it did not have access to the information that the SSA used to determine Plaintiff was disabled, which is, in any event, not worthy of credence given that Aetna funded the litigation of Plaintiff's SSDI benefits claim. Despite stating that he reviewed

---

[6]

    Beginning September 1, 2010, Plaintiff's monthly LTD gross benefit amount was reduced by the $1,235.00 she received each month in SSDI benefits. (AR.1218-19).

the SSA records, Dr. Polanco did not mention, let alone address, the SSA's award of benefits to Plaintiff. The Court finds that all of these factors strongly "suggest[ ] procedural unreasonableness," Glenn, 554 U.S. at 118 (remarking that the plan administrator's failure to address the SSA's award of benefits "suggested procedural unreasonableness" when the plan administrator encouraged the claimant to seek SSD benefits).

### C. Aetna's Failure to Order an Independent Medical Examination

Aetna declined to order an in-person, independent medical examination ("IME"), although the Plan provides that Aetna "will have the right and opportunity to examine and evaluate any person who is the basis of any claim . . . ." (AR.11). Plaintiff argues that this constitutes a "violation" of Aetna's "obligations under ERISA," because the failure to order an IME led to independent consultant Dr. Polanco "necessarily ma[king] an adverse credibility determination" against her, without the benefit of an in-person examination. Pl's Mem. (Dkt #17) at 12 (citing Smith v. Cont'l Cas. Co., 450 F.3d 253, 263 (6th Cir. 2006)).

Courts have found that under certain circumstances, an insurer-administrator's failure to request an IME, despite authority to do so in the benefits plan, supports a finding that it acted arbitrarily. See, e.g., Smith, 450 F.3d at 263-64 (finding that where plan administrator had reserved the right to obtain IME of claimant, decision by plan administrator to not require an

-22-

examination was considered as part of the arbitrary and capricious review, "especially because [the medical consultant] made credibility determinations concerning [the claimant]'s subjective complaints") (citing <u>Calvert v. Firstar Fin., Inc.</u>, 409 F.3d 286, 292 (6th Cir. 2005)).

Here, Aetna's internal claims reviewer and its medical consultant, Dr. Polanco, based their rejection of Plaintiff's claim solely on the absence of "objective findings" to corroborate her complaints of intractable pain sufficient to preclude full-time work capacity. For instance, in his report, Dr. Polanco discounted all functional capacity limitations from her treating providers because they were based on self-reports from Plaintiff and had not been substantiated through clinical or diagnostic findings. It is apparent that, in Aetna's opinion, Plaintiff's claim for LTD benefits stood or fell on the credibility of her subjective complaints. The Plan afforded Aetna the authority to require that Plaintiff undergo an IME. Under these circumstances, the Court finds that Aetna's decision to not perform this examination supports the finding that its determination was arbitrary and capricious.

**D.   Plaintiff's Other Arguments**

Plaintiff has raised a number of other arguments, including a claim of judicial estoppel based on the favorable SSA decision, a variation of the "treating physician" rule applicable to

adjudicating claims before the SSA, and allegations that Dr. Polanco is incompetent and biased in favor Aetna. Because the Court has already found sufficient grounds for overturning Aetna's decision, it need not address Plaintiff's other arguments.

## III. Remedy

Plaintiff requests reversal of Aetna's decision and an order directing that Aetna pay her LTD benefits through the remainder of the "any occupation" period. Plaintiff also seeks an award of attorney's fees. Aetna urges that remand for further administrative proceedings would be the proper remedy, should this Court determine that its determination was arbitrary and capricious.

Where, as here, review is under the arbitrary-and-capricious standard, district courts are required to limit their review to the administrative record. "[I]t follows that, if upon review a district court concludes that the [administrator's] decision was arbitrary and capricious, it must remand to the [administrator] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995) (quoting Wardle v. Central States, Southeast & Southwest Areas Pension Fund, 627 F.2d 820, 828 (7th Cir. 1980); further citation omitted). At the time of Aetna's final adverse decision, the record in this case spanned 7 years and included a finding of disability

by the SSA. No reasonable argument can be made that record is incomplete. The only "new" evidence that would be considered on remand would be an IME of Plaintiff. However, Aetna had more than ample opportunity to order an IME of Plaintiff, yet deliberately declined to do so. Moreover, Aetna previously granted benefits to Plaintiff based solely on its internal reviews of her medical records, even under the more rigorous of the two definitions of disability provided for in the Plan. It bears emphasizing that Aetna based its previous favorable determinations on the same medical evidence later found by Dr. Polanco to be insufficient to establish Plaintiff's disability. It is important to point out that Dr. Polanco relied on the record only, without the benefit of a personal examination of Plaintiff. Under these circumstances, the Court finds that no new evidence could produce a reasonable conclusion permitting a non-arbitrary denial of the claim. Remand would, in this case, be a useless formality.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Dkt #16) is granted to the extent that  Defendant is ordered to reinstate Plaintiff's monthly  benefits and pay past due benefits. The Motion (Dkt #16) is denied without prejudice as to the request for interest under New York Civil Practice Law and Rules §§ 5001-5004 and attorney's fees and costs. Defendant's Cross-Motion for Summary Judgment (Dkt #20) is denied.

**SO ORDERED.**

**S/ Michael A. Telesca**

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     June 30, 2016
           Rochester, New York